## Warren *et al. versus* Philadelphia Coal Company.

| 83 | 437 |
| 163 | 205 |

1. In an ordinary contract of sale of personal property the vendor is subject to no implication of a warranty of the quality of the articles sold, but there is nothing in this rule to forbid a vendor from making a contract stipulation that he will be answerable to the purchaser for the quality.

2. Where, therefore, the vendees alleged the existence of a contract with vendors that defined their rights and there was evidence from which the jury might have inferred an agreement on the part of the vendors to be answerable for the quality of a lot of coal they were to deliver, it was error to withhold evidence of this warranty from the jury.

February 2d 1877.　Before AGNEW, C. J., SHARSWOOD, MER-CUR, GORDON, PAXSON and WOODWARD, JJ.　WILLIAMS, J., absent.

Error to the Court of Common Pleas, No. 3, of *Philadelphia county*: Of July Term 1875, No. 58.

Assumpsit by the Philadelphia Coal Company against a firm, trading as E. C. & P. H. Warren, on a book account to recover the price of a cargo of coal.

At the trial, it appeared that Spofford & Clark, the agents of the Coal Company, sold the coal to defendants and it was delivered at the wharf of the latter and partly placed upon some other coal lying thereon. The defence, chiefly, was that the coal delivered was not such as plaintiffs' agents had agreed to furnish and that it was useless for the purposes of defendants.

The plaintiffs offered in evidence the books of original entries of Spofford & Clark, which offer the court overruled because they were not the books of the company. Subsequently, in the course of the examination of Spofford, defendants offered in evidence a bill rendered to them which was taken from the books of Spofford & Clark, to show that they were general shippers of coal and not agents of the company.

This bill it seemed was the only evidence in the case of the number of tons of coal sold and delivered to defendants. The defendants neither disputed nor admitted the correctness of the bill. The admission of this bill in evidence, to charge the defendants with the coal after the books of said agents had been ruled out, constituted the first assignment of error.

To sustain an alleged warranty of the quality of the coal one of defendants testified as follows:—

"I had bought considerable coal from Spofford & Clark. I don't think I bought this cargo. After I had bought all that I expected to buy Spofford came and asked me to relieve him by taking a cargo he had afloat. I inquired particularly of the quality of this coal. He assured me that it was of the same quality as I had been buying. I told him if so to put it on the wharf at $4 per ton, but if it was not good coal I would not have it."

The defendants then offered to show, "that the coal sold by plaintiffs injured, hindered and delayed the defendants in the prose-

cution of their business and that they suffered loss and damage thereby;" "that the defendants use their coal for the purpose of raising steam at their paper mill; that the plaintiffs knew the purpose for which it was intended to be used; and that it was unfit for that purpose;" "that a large portion of the coal on which this coal was placed, was Philadelphia Coal Company's coal, sold to the defendants by Spofford & Clark, and that this cargo was not as good." These three offers were all rejected by the court, and the refusals to admit them constituted the third, fourth and fifth assignments of error.

The deposition of G. W. Montgomery, a coal dealer, was offered on behalf of defendants, wherein he stated in substance that the coal on Warren's wharf looked precisely like the coal he had received from Spofford & Clark, which was very bad and had to be taken out of the cellars of parties to whom he had sold it. He saw the coal on the wharf and examined it, and in his judgment it was the same coal. The coal he bought was purchased from the same parties and the bill of lading said it was shipped by the Philadelphia Coal Company.

The court ruled out this deposition, which was the sixth assignment of error.

On the cross-examination of Spofford, one of the agents, defendants proposed to ask him, "Had not Mr. Warren, on several occasions and repeatedly, told you that if you did not send him good coal that he would not pay for it, and you must take it away?" which the court refused to allow, and this was the seventh assignment.

The verdict was for the plaintiffs for $604.90.

The defendants took this writ, and the assignments of error, *inter alia*, were those noted above.

*Harvey C. Warren,* for plaintiffs in error.—The defence below was not that the coal was comparatively bad, but that it was practically useless, and that its use would hinder and delay defendants' business, and hence that plaintiffs ought not to recover.

The offers in this direction should have been admitted at least to reduce plaintiffs' claim. The evidence showed that there was a distinct contract that the coal should be of the same quality as that which defendants previously bought, and which had been satisfactory and fitted for their uses. Defendants' uses were known to Spofford, and the offers in the 4th and 5th assignments were to show that the coal was not fit for those purposes and not as good as that before delivered.

*George M. Dallas,* for defendants in error.—The fact that the coal had been represented as being well adapted for the purpose of raising steam, and that by reason of its impure quality a larger quantity was required, would be insufficient to constitute a warranty: Whitaker *v.* Eastwick, 25 P. F. Smith 229.

[Warren *v.* Philadelphia Coal Co.]

To constitute a warranty that the thing sold is fit for a special purpose, it must have been ordered of the manufacturer, and supplied and sold for that purpose.   Where a *special thing* is ordered, even for a special purpose, no warranty arises ; nor from mere statements and assertions concerning what the article will do : 1 Pars. Cont. 587, and cases cited in notes ; Weimer *v.* Clement, 1 Wright 149.

The evidence was conflicting as to quality, and was all admitted. There was nothing in the case to make the especial comparison proposed by the 5th assignment a proper subject for the jury's consideration.   The offer (7th assignment) to show what had been said by one of the plaintiffs in error to the witness Spofford, about other coal, at other times, was equally objectionable, and was, it is submitted, rightly excluded.

Mr. Justice WOODWARD delivered the opinion of the court, March 30th 1877.

No rule is more firmly imbedded in our jurisprudence than that which governs the rights of vendors and purchasers in an ordinary contract of sale of personal property.   In such a contract the vendor is subject to no implication of a warranty of the quality of the article sold.   The doctrine of the common law, as it was settled in Chandelor *v.* Lopus, Cro. Jac. 4, has been constantly and uniformly applied.   In the language of Mr. Justice DUNCAN in Jackson *v.* Wetherill, 7 S. & R. 480, "with regard to the goodness of wares purchased, the vendor is not bound to answer unless he expressly warrant them to be sound and good, or there has been a fraudulent representation—an affirmation of the quality known to the vendor to be false."   Chief Justice GIBSON and Mr. Justice KENNEDY dissented even from the judgment in Borrekins *v.* Bevan, 3 Rawle 23, which decided that in all sales of goods a warranty was to be implied that the article delivered should correspond in specie with the commodity sold.   That case introduced a distinction between quality and essential character which was a novelty at the time, but has since been generally maintained.   In the dissenting opinion the Chief Justice said : "I prefer the rule of the common law to the modern approximations towards that of the civil law ; not only because it is the rule of the common law, but because it seems to be more convenient and just. * * * The object of the rule is to encourage trade by preventing actions against all in·turn through whose hands the article has passed in a course of dealing.   The doctrine of Borrekins *v.* Bevan has never been extended.   The common-law rule has been enforced so lately as in the reported case of Whitaker *v.* Eastwick, 25 P. F. Smith 229, and in the case of Boyd *v.* Wilson (*ante*, p. 319), decided at the present term.

On the grounds thus stated, the court below was justified in rejecting the offers of the defendants specified in the third and fourth

[Warren *v.* Philadelphia Coal Co.]

assignments of error. The purpose was to show, first, that the character of the coal shipped to them injured their business, and secondly, that it was defective and not adapted for the uses to which it was designed to be applied. The evidence was offered not in view of the special circumstances of the case as they were alleged to exist, but upon the assumption of a legal implication of a warranty arising from a single fact of the sale itself. Coal had previously been received from the plaintiffs. Under a general contract for a fresh supply, the defendants would be required to accept from the plaintiffs the current product of their mines, and for that product the plaintiffs, acting in good faith and in the accustomed course of their business, would be entitled to be paid.

But there is more in this case than the questions raised by the third and fourth assignments. Nothing in the common-law rule on this subject stands in the way of a contract stipulation as to quality between a vendor and a purchaser. And it was insisted on the trial that such a stipulation had been entered into by these parties. When the offers specified in the fifth and seventh assignments were made, Parker H. Warren had testified that Spofford, the agent of the plaintiffs, had asked him to take the cargo of coal, the price of which is the subject of this controversy. "I inquired particularly," the witness had said, "of the quality of this coal. He assured me it was of the same quality I had been buying. I told him if so, to put it on the wharf at $4 per ton, but if it was not good coal I would not have it." In view of this testimony, the defendants proposed "to show that this cargo of coal was placed on a large pile of coal, a great portion of which was Philadelphia Coal Company's coal, sold to the defendants by the agent of the plaintiffs, and this cargo was not as good." It was proposed also to ask Mr. Spofford, on cross-examination, this question: "Had not Mr. Warren on several occasions, and repeatedly, told you that if you did not send him good coal, he would not pay for it, and you must take it away?" Both these offers of testimony were rejected. They ought to have been received. The defendants alleged the existence of a contract that defined their rights, and there was evidence from which the jury might have inferred an agreement on the part of the plaintiffs to be answerable for the quality of the coal they were to deliver. To constitute an express warranty no special form of words is requisite. The word warrant, though it is the one generally used, is not so technical that it may not be supplied by others. It is enough if the words used are not dubious or equivocal, and if it appears from the whole evidence that the affirmant intended to warrant, and did not express a mere matter of judgment or opinion: Jackson *v.* Wetherill, *supra.* A contract to deliver goods of a quality, as well as of a species, defined and fixed, is as capable of enforcement as any other contract.

So much of Mr. Montgomery's deposition as contained a descrip-

[Warren *v.* Philadelphia Coal Co.]

tion founded on his personal knowledge of the coal delivered to the defendants should have been admitted. The evidence that his own coal had been received from the plaintiffs was scarcely distinct enough to warrant a characterization of that of the defendants by a comparison of his with theirs. It does not appear clearly from the record how the transcript from the books of the agents of the plaintiffs became part of the evidence in the cause after the books themselves had been excluded. It was legitimately before the jury if, as the plaintiffs assert, it was produced and offered by the defendants. If there was error it can be avoided in a future trial. The second assignment was withdrawn on the argument. The eighth assignment refers to a matter of mere detail, which for any purpose to be served hereafter it would be unprofitable to discuss.

Judgment reversed, and *venire facias de novo* awarded.